IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEW D. and JENNIFER D., | : | CIVIL ACTION |
| individually, and as the Parents and | : | |
| Natural Guardians of M.D., | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| AVON GROVE SCHOOL DISTRICT, | : | NO.  12-0777 |
| Defendant. | : | |

MEMORANDUM

RESTREPO, J.                                                                                                    JULY 13, 2015


Plaintiffs, Matthew D. and Jennifer D., individually and on behalf of their son, M.D.,

bring this action against defendant, Avon Grove School District ("the District"), under the

Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. §§ 1400-1482, and

Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, requesting tuition

reimbursement for plaintiffs' unilateral placement of M.D. at a private school, as well as costs

and fees.  Plaintiffs appeal from the adverse decision of a Special Education Hearing Officer

denying tuition reimbursement for unilateral placement of M.D. at a private school.[1]

Before the Court are the parties' cross-motions for judgment on the administrative

record.[2]  For reasons provided below, plaintiffs' motion requesting reimbursement for tuition and

costs related to M.D.'s placement at White Clay Learning Center ("White Clay"), as well as fees

and costs associated with this matter, is denied, and defendant's motion is granted in that regard.

---

[1] Although this case was originally assigned to the calendar of the Hon. C. Darnell Jones, it was reassigned to me.

[2] Thus, the parties are in agreement that this case is appropriately decided on the record before the Court.

## I.    BACKGROUND [3]

M.D. was born on October 30, 2000, and he was 11 years old at the time of the Hearing

Officer's decision on November 17, 2011.  (N.T. Admin. Hr'g (hereinafter cited as "N.T.") at 16,

17.)[4]  It is not disputed that he has been a resident of the District at all relevant times for

purposes of this case.

M.D. had been attending White Clay since January 2008 (midway through his first grade

year), and he had Paula Coleman as his lead teacher beginning in late August 2008.  (N.T. 323-

27.)  White Clay had a population of 22 students and M.D.'s class consisted of 10 students.

(N.T. 322, 329.)  Ms. Coleman received three years of training with White Clay's director,

"master's credits at Immaculata University," "training courses in [autism spectrum disorder,]

augmentative devices" from Pennsylvania Training and Technical Assistance Network

("PaTTAN"), and training in writing and reading programs such as "Lindamood-Bell" and "VB-

MAPPing."  (N.T. 319.)  Ms. Coleman did not have any certification from the Pennsylvania

Department of Education, and such certification was not required at White Clay.  (N.T. 320.)  In

addition to Ms. Coleman, a learning specialist assistant, Lare Gilpin, provided reading instruction

to M.D. (starting in the 2010-2011 school year), and two aides provided support in supervising

the students in M.D.'s class.  (N.T. 329, 489-90.)

---

[3] Unless otherwise specifically noted, the following facts existed at the time of the administrative hearing.

[4] The administrative hearing was held on July 21 and Oct. 3, 5, and 10 in 2011.  *See* Hrg. Officer's
Decision dated 11/17/11 (herein cited as "Admin. Dec."), at 1.

### (A)  2007 EVALUATION REPORT

Since the beginning of kindergarten, M.D. struggled with academic and behavioral issues.  (N.T. 161-165; Pls. Exs. 1-5.)  The District's records reveal that M.D. was disciplined for spitting, poking another child in the eye (Pls. Ex. 3), pinching and punching another student (Pls. Ex. 10), hitting and kicking others (Pls. Ex. 11), and destruction of school property (Pls. Ex 12).  Despite receiving instructional support during kindergarten, M.D. continued to have difficulties with colors, numbers, names, autonomy, speech articulation, and expressive language (Pls. Exs. 5 & 6).

In January 2007, midway through M.D.'s kindergarten year, M.D. was referred for an evaluation to identify any disabilities.  (Pls. Ex. 6, at 1-2.)  The results of the behavioral assessments by M.D.'s kindergarten teacher and parents showed extreme differences in M.D.'s behaviors between home and school.  (Pls. Ex. 6, at 13-14.)  Since M.D. displayed hyperactive and off-task behaviors mainly in the classroom and not at home, the District's school psychologist, Valerie Piskorski, concluded that M.D.'s problematic behaviors were related to sensory needs which in turn negatively impacted his educational performance.  (Pls. Ex. 6, at 2, 14.)  Further, standardized tests of M.D.'s cognitive ability and achievement yielded scores in the average range.  (Pls. Ex. 6, at 12, 15.)  Based on these findings, the psychologist determined that M.D. did not require specialized instruction, and the District's initial Evaluation Report, dated May 21, 2007 ("2007 ER") stated that M.D. did not meet the criteria for any disability category. (*Id.*)  Due to M.D.'s sensory input needs and fine motor skills deficits, however, the District offered M.D. a Section 504 Service Agreement ("SA") that provided weekly 30-minute occupational therapy ("OT").  (*See* Pls. Ex. 8.)

### (B)  TRANSFER TO WHITE CLAY AND THE 2008 ER

M.D. continued to engage in disruptive behavior while at school and as a result, spent considerable time segregated from his classmates in a "time out" room.  (N.T. 160, 173-75.)  At the end of kindergarten, M.D. met expectations in only one area: spatial relations.  (Def. Ex. 12.) At the end of the first quarter of first grade (in 2007), M.D. failed to meet any expectations listed on the K-2 report card.  (*Id.*)  In January 2008, which was in the middle of M.D.'s first grade year, plaintiffs enrolled M.D. at White Clay (N.T. 179-180) where plaintiffs had been acquainted with the director of the small private school (N.T. 211-12).

In March 2008, at the suggestion of White Clay, plaintiffs asked the District to reevaluate M.D. to identify any disabilities.  (Pls. Ex. 13.)  A different school psychologist, William Roth, conducted a reevaluation in the summer of 2008.  (Pls. Ex. 18, at 11.)  In his evaluation report, Mr. Roth concluded that, despite the deficiencies M.D. displayed, M.D. did not require special education services.  (Pls. Ex. 18.)  Moreover, Mr. Roth believed the accuracy of the test results on M.D.'s cognitive potential and achievement were questionable due to M.D.'s unruly and "manipulative" behavior during the evaluation.  (N.T. 283-84, 301-04.)

In reaching his conclusion, the psychologist gave more weight to behavior assessments and an alleged statement by M.D.'s mother that M.D. was not a special needs student, which M.D.'s mother disputes making, over the behavior evaluations of M.D.'s teacher at White Clay. (Pls. Ex. 18, at 2; N.T. 219, 244, 281-82, 299-03.)  Mr. Roth's evaluation report dated August 11, 2008 also included a recommendation that M.D. receive a functional behavioral assessment ("FBA").  (Pls. Ex. 16, at 9.)  The administrative record does not appear to reflect that an FBA was performed in 2008.  (*See* Pls. Exs. 15-19.)

An amended version of the evaluation report, dated September 29, 2008 ("2008 ER"), includes the results of M.D.'s reevaluation for OT.  (Pls. Ex. 18, at 7; N.T. 285.)  Plaintiffs disagreed with the 2008 ER and did not sign the corresponding Notice of Recommended Educational Placement ("NOREP").  (N.T. 188; s*ee* Pls. Ex. 19.)

### (C)  2010 INDEPENDENT EDUCATIONAL EVALUATION

When M.D. started at White Clay in the middle of first grade, he was essentially performing at the kindergarten level.  (N.T. 324-25.)  During M.D.'s second and third grades, the primary focus for M.D.'s school days was to control his disruptive behavior.  (N.T. 326, 371-73, 418-21.)  However, despite an attempt to implement certain behavior plans, M.D. still displayed significant behavior issues that required frequent re-direction by his teachers.  (*Id.*)  Plaintiffs considered re-enrolling M.D. in the District for fourth grade, but ultimately decided against it when they were informed that M.D. could not be placed into one of the District's multi-age classes.  (N.T. 189-193; *see* Pls. Ex. 22.)

In the summer of 2010, after M.D.'s third grade year, plaintiffs obtained an independent educational evaluation ("IEE"), at White Clay's request, because the reading instruction that M.D. was receiving had not been effective.  (N.T. 418-22.)  The independent evaluator identified a number of deficits in reading, writing, and math arising from a language-based learning disability.  (*See* Pls. Ex. 23.)  The evaluator's findings met the criteria set forth under IDEA for needing special services, and she recommended several reading and writing programs for M.D.'s instructors.  (*Id.*)

By Fall of 2010, White Clay reported no academic strengths for M.D.  (Pls. Ex. 26, at 4-5.)  M.D. functioned at the pre-kindergarten to kindergarten level in reading decoding, fluency, and comprehension, pre-kindergarten to kindergarten level in math problem-solving, and at the

first grade level in math calculation.  (*Id.*)  The learning specialist, hired as a result of the IEE

report, reported that M.D.'s behavior continued to negatively impact his learning.  (N.T. 500-02,

516-17.)  Starting in fourth grade, M.D. received various reading and math programs (s*ee* Pls.

Ex. 23; N.T. 335-39, 492-00, 510) and an hour of "lego therapy" twice a week, in an attempt to

improve fine motor skills and develop social skills (N.T. 502-05, 518).

### (D)  2010 ER AND REJECTION OF THE IEP

After providing the IEE report in the middle of M.D.'s fourth grade year, the District

offered to conduct a third evaluation of M.D., to which plaintiffs agreed.  (N.T. 194-95.)  This

evaluation was performed by the District's school psychologist, Kristine Kristman Jarrett.  (*See*

Pls. Ex. 24.)  The District's evaluation, dated November 18, 2010 ("2010 ER"), reflected that

M.D. was IDEA-eligible under the disability category, Other Health Impairment ("OHI"), based

on a Pervasive Developmental Disorder, Not Otherwise Specified ("PDD/NOS") and that M.D.

had a speech impairment and a need for specially-designed instruction.  (*See* Pls. Exs. 24-26;

N.T. 539-47.)   Although the conclusions in the 2010 ER differed from those in the 2007 and

2008 ERs, the supporting data from the three evaluations reveal that behavior ratings by M.D.'s

teachers and assessment results of his cognitive ability remained relatively consistent.  (Pls. Ex.

6, at 12-14; Pls. Ex. 18, at 5-7; Pls. Ex. 26, at 7-11; N.T. 557-58.)  Based on assessment results

similar to those from the IEE, the 2010 ER included PDD/NOS, rather than a specific learning

disability.  (Pls. Ex. 23, at 5-6; Pls. Ex. 26, at 8-9; N.T. 547-48.)

Plaintiffs and the District's multidisciplinary team met for an individualized education

program ("IEP") meeting on December 16, 2010, wherein the IEP offered provided that M.D.

spend half the school day in an age-appropriate regular education classroom and the rest of the

day in a special education class.  (Pls. Exs. 27, 36-37, 39.)  In addition, through the proposed

IEP, M.D. would receive 30 minutes per week of OT and speech therapy and an hour per week

of social skills instruction.  (*Id.*)  The IEP included goals in the areas of speech, OT, reading,

written expression, math, and behavior and social skills.  (*Id.*)  In the special education class, the

District planned to give M.D. multi-sensory instruction in a small group setting and specific

strategies to support the educational and behavioral goals listed in the IEP.  (*Id.*)

Plaintiffs rejected this IEP due to a concern regarding the level of support available in a

regular education classroom.  (*Id.*; N.T. 197.)  In a letter to the District dated March 22, 2011,

plaintiffs stated that the District's proposed IEP failed to address all of M.D.'s special needs and

that M.D. was performing well at White Clay.  (Pls. Ex. 29.)  Further, plaintiffs requested that

the District pay for M.D. to continue his enrollment at White Clay.  (*Id.*)  On April 15, 2011,

plaintiffs requested a due process hearing, seeking reimbursement for the IEE, tuition and

transportation costs related to M.D.'s placement at White Clay from April 2008 through the end

of the 2010-2011 school year, and for support for M.D.'s future attendance at White Clay.  (*See*

Pls. Ex. 30.)

### (E)  ADMINISTRATIVE HEARING AND HEARING OFFICER'S DECISION

Following a hearing that spanned four days and after reviewing numerous exhibits, the

Special Education Hearing Officer found that the District had erroneously determined that M.D.

was ineligible for special education services after the 2008 ER at the latest, and that the District

violated M.D.'s right to a free appropriate public education ("FAPE") under IDEA.  (*See* Admin.

Dec. at 1, 14-16.)  Although the Hearing Officer concluded that the District failed to provide a

FAPE, she denied plaintiffs' claim for reimbursement because White Clay was an inappropriate

placement.  (*Id.* at 19.)  The Hearing Officer also determined that the District's proposed IEP

was appropriate.  (*Id.* at 18-19.)

The Hearing Officer's Decision stated:

> There are two distinct periods in dispute . . ., and the underlying
> denial of FAPE analysis is somewhat different for each period.
> Although [M.D.'s parents] have limited their claim for relief to two
> years prior to the date they filed their due process complaint, the
> basis for the tuition denial of FAPE/tuition reimbursement claim
> from April 2009 through December 2010 originated, at the latest,
> with the District's September 2008 reevaluation and conclusion
> that [M.D.] was not IDEA eligible.

(Admin. Dec. at 14.)  The Hearing Officer found that, although "the District clearly fulfilled the

first part of its child find obligation in 2007 since it sought an evaluation of [M.D.] at the end of

the kindergarten year and conducted a thorough evaluation," there was "considerable question

with respect to whether the District correctly concluded that [M.D.] was not IDEA eligible at that

time" in light of the school psychologist's conclusion that M.D. met the standards for the OHI

disability category, as well as the psychologist's identification of "an occupational therapy

disorder manifesting through behaviors."  (*Id.*)  However, "since [M.D.] withdrew from the

District to enroll in a private school less than a year later and did not seek tuition reimbursement

at that time," the Hearing Officer pointed out that further analysis of the District's conclusion in

2007 was unnecessary.  (*Id.* at 14-15.)

The Hearing Officer recognized that "the District had a second opportunity to evaluate

[M.D.] and make an appropriate eligibility determination[,] . . . but again concluded that [M.D.]

was not IDEA eligible."  (*Id.* at 15.)  Upon reviewing the evaluation report and "hearing the

testimony of the contracted school psychologist who conducted the evaluation for the District,"

the Hearing Officer was "left [with] the disquieting impression that the non-eligibility

determination arose from the psychologist's annoyance with [M.D.'s] behaviors during the

evaluation, which caused him to conclude that the results of the evaluation were of questionable

validity." (*Id.* at 15 (citing N.T. 301).)  The Hearing Officer pointed out that "[t]he psychologist

conceded that the same kinds of behaviors that interfered with the evaluation could also have

interfered with [M.D.'s] functioning in school, and that the behaviors he observed during the

evaluation were entirely consistent with teacher ratings of [M.D.'s] behaviors provided in

connection with both the 2007 and 2008 evaluations." (*Id.*)

        The Hearing Officer found that "[t]he District failed in its obligation to appropriately

interpret the data it compiled through the 2008 evaluation process and to correctly identify

[M.D.] as eligible for special education services." (*Id.* at 16.)  As the Hearing Officer explained,

among other things, "[t]he consistency of [M.D.'s] behaviors in school noted by two different

teachers more than a year apart should, at the least, have stimulated further inquiry into whether

the behaviors could have been related to a disability such as ADHD, PDD, an autism spectrum

disorder or emotional disturbance." (*Id.*)  The Hearing Officer further found: "Even without the

benefit of hindsight, knowing now that [M.D.] has serious needs, the record establishes that there

were sufficient questions, based on a very recent history, to further explore a number of possible

disability categories and further investigate [M.D.'s] functioning in school." (*Id.* at 15-16.)

Thus, the Hearing Officer found that the "District's erroneous non-eligibility conclusion in the

fall of 2008 precluded any possibility of offering [M.D.] a FAPE from April 2009 through the

entire 2009/2010 school year and the beginning of the 2010/2011 school year, until the date the

District offered [M.D.] an IEP, thereby establishing the first criterion for a tuition reimbursement

claim for that period." (*Id.* at 16.)  However, the Hearing Officer concluded:

> Although the District should have concluded that [M.D.] was a
> child with a disability after the 2008 evaluation at the latest, and
> offered special education services, tuition reimbursement must be
> denied for the period April 2009 to December 2010 because the

private school was not an appropriate placement.  For the same reason, tuition reimbursement is also denied from December 2010 forward.

(Admin. Dec. at 2.)

## II.   STANDARD OF REVIEW

The Court has jurisdiction pursuant to 20 U.S.C. § 1415(i).  When a district court reviews state administrative proceedings regarding IDEA claims, the applicable standard is "modified *de novo* review."  *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 263 (3d Cir. 2003).  District courts are required to give "due weight" to the factual findings of the Hearing Officer in IDEA cases.  *Id.* at 269.  This means that factual findings from the administrative proceedings are to be considered *prima facie* correct.  *Id.*  "If a reviewing court fails to adhere to [the factual findings of the administrative proceeding], it is obliged to explain why."  *Id.* at 270 (quoting *M.M. v. Sch. Dist. of Greenville County*, 303 F.3d 523, 531 (4th Cir. 2002)) (citations omitted).  In particular, if the court does not hear additional evidence, it must find support in the administrative record for any factual conclusions different from those of the Hearing Officer by pointing to the "contrary nontestimonial extrinsic evidence."  *Id.*  District courts should be cautious and refrain from imposing their "own view of preferable educational methods on the states."  *Oberti v. Bd. of Ed. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1219 (3d Cir. 1993).  Within the confines of these standards, the district court's findings must be based on the preponderance of the evidence.  *D.S. v. Bayonne Bd. of Ed.*, 602 F.3d 553, 564 (3d Cir. 2010); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir. 1995).

## III.   DISCUSSION

IDEA requires that any state receiving federal education funds provide a FAPE to disabled students.  *See* 20 U.S.C. § 1412(a)(1).  Further, each public school district in a state that receives federal funds under IDEA must "identify and evaluate all students reasonably believed to have a disability," which is known as the "Child Find" obligations.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267 (3d Cir. 2014), *cert. denied*, 135 S. Ct. 1738 (2015). Pennsylvania's Child Find procedures are set forth in 22 Pa. Code §§ 14.121 through 14.125.  *Id.* In providing a FAPE, school districts must work with parents to design an IEP which meets the unique needs of the disabled child.  *Id.*  "At a minimum, the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities," but it need not provide "optimal level of services."  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (citations omitted).

If there is a dispute concerning whether a child is being provided with a FAPE based on the adequacy of a proposed IEP or the failure to provide a child with an IEP, IDEA provides procedural safeguards for either the school district or the child's parents to raise a challenge in an administrative due process hearing.  *Id.* (citing 20 U.S.C. § 1415(f)); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 231 (2009).  Any party aggrieved by an adverse action by the administrative proceeding can appeal the decision in a state or federal court.  20 U.S.C. § 1415(i)(2)(A).  The burden of persuasion in an administrative hearing under IDEA lies with the party seeking relief, *see Ridley*, 680 F.3d at 270 (citing *Schaffer v. Weast*, 546 U.S. 49, 62 (2005)), and the party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged, *id.* at 270.

In order for plaintiffs to obtain reimbursement for their unilateral placement of M.D. at White Clay, the District must have failed to comply with IDEA's procedural requirements and this failure must have resulted in a loss of educational opportunity for M.D. or caused a deprivation of his educational benefits.  *See Bayonne*, 602 F.3d at 564-65.  A procedural violation under IDEA includes a school district's failure to comply with its Child Find duties. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012).

 "[P]arents who believe that a public school is not providing a FAPE may unilaterally remove their disabled child . . . and seek tuition reimbursement for the cost of [] alternate placement" pursuant to § 1412(a)(10)(c).  *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 242 (3d Cir. 2009).  "[P]arents who unilaterally change their child's placement," however, "without the consent of state or local school officials, do so at their own financial risk."  *W.D. v. Watchung Hills Sch. Bd. of Ed.*, 602 F. Appx. 563, 566-67 (3d Cir. 2015) (quoting *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Ed. of Mass.*, 471 U.S. 359, 373 (1985)); *Forest Grove*, 557 U.S. at 231 (citing *e.g., Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 15 (1993)) ("[P]arents unilaterally change their placement at their own financial risk.").

The Supreme Court has fashioned a test for determining whether parents are entitled to reimbursement from the school district when they unilaterally place their child in a private school.  *See Carter*, 510 U.S. at 12-15 (citing *Burlington*, 471 U.S. at 369-74).  To grant parents reimbursement for their expenditures on private special education for a child, a court must determine that: (1) the school district failed to provide the required FAPE, *i.e.*, the public school placement was inappropriate; **and** (2) the alternative placement chosen by the parents was proper under the Act.  *Mary T.*, 575 F.3d at 242.  If so, the reviewing court must decide that equitable considerations weigh in favor of the reimbursement.  *Id.*; *Burlington*, 471 U.S. at 369-70.  With

regard to equitable considerations, "IDEA directs that an award of private school tuition 'may be reduced or denied' under a variety of circumstances, including 'upon a judicial finding of unreasonableness with respect to actions taken by the parents,' 20 U.S.C. § 1412(a)(10) (C)(iii)(III), or where parents fail to give the school district ten days notice prior to enrolling a child in private school, *id.* § 1412(a)(1)(C)(iii)(I)(bb)." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 71 (3d Cir. 2010); *see Watchung Hills*, 602 F. Appx. at 567-68 (denying plaintiff's claim that district court erred in dismissing plaintiff's reimbursement claim based on parent's failure to provide timely notice of removal without first evaluating whether the school district had denied plaintiff a FAPE).

Thus, parents who unilaterally change their child's placement "are entitled to reimbursement **only** if a federal court concludes both that the public placement violated IDEA **and** that the private school placement was proper under the Act." *Carter*, 510 U.S. at 15 (second emph. added).  Here, since plaintiffs do not satisfy the second prong of the applicable standard, it is unnecessary to address the first prong.  *See, e.g., Mary T.*, 575 F.3d at 248-49 ("[W]e do not believe that [the private school] can be considered an appropriate placement.  Because we conclude this aspect of the test for tuition reimbursement has not been met, Plaintiffs are not entitled to tuition reimbursement.  Furthermore, Plaintiffs' failure to demonstrate the appropriateness of the private placement means that we need not determine whether the School District deprived [Plaintiff] of a FAPE for tuition reimbursement purposes.")

As explained, the second prong of the applicable test asks whether plaintiffs' private school placement was proper under the Act.  "A private placement is 'proper' if it (1) is 'appropriate,' *i.e.*, it provides 'significant learning' and confers 'meaningful benefit,' and (2) is

provided in the least restrictive [appropriate] educational environment."[5] *Lauren W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007) (quoting *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 248-49 (3rd Cir. 1999)); *see H.L. v. Downingtown Area Sch. Dist.*, 2015 WL 3621853, *5 (3d Cir. June 11, 2015).

The District requests that this Court not disturb the Hearing Officer's finding that White Clay did not meet the minimal criteria for an appropriate program. *See* Def.'s Opp. 7. Plaintiffs, on the other hand, challenge that portion of the Hearing Officer's decision. *See* Pls.' Br. 2. In support of her decision, the Hearing Officer noted that "[t]he record establishes that [White Clay] is even now barely attempting to provide math instruction, and was primarily focused on controlling [M.D.'s] behaviors from the time [M.D.] enrolled until the fall of 2010." (*See* Admin. Dec. at 17 (citing Hearing Officer's ("H.O.'s") Findings of Fact ("FF") 19, 37); *see also* N.T. 324-26, 371-73, 382-84, 418-21, 337-39; Pls. Ex. 32, at 3-5; Pls. Ex. 23, at 7-8.) Indeed, the Hearing Officer pointed out that it was not until plaintiffs received and shared with White Clay the results of the Summer 2010 IEE that the private school understood the severity of M.D.'s needs and finally began providing M.D. with focused reading instruction. (*See* Admin. Dec. at 17 (citing H.O.'s FF 22, 23, 24, 25, 26, 30, 34, 35); *see also* N.T. 326-27, 490, 491, 492, 493-95, 498, 510, 512-13, 520-21, 529-32; Pls. Ex. 23.) The Hearing Officer further pointed out that M.D.'s parents had arranged for the IEE at the suggestion of White Clay, which, in effect, indicated "that the reading instruction it had been providing to [M.D.] was ineffective." (*See* Admin. Dec. at 17 (citing H.O.'s FF 21); *see also* N.T. 344, 367-69, 372.) In addition, the Hearing Officer found that, although M.D.'s teacher testified that White Clay develops a customized curriculum plan for every child (*see* Admin. Dec. at 17 (citing H.O.'s FF 17)), "no

_____

[5] The District does not appear to specifically challenge the least restrictive appropriate environment component of M.D.'s placement at White Clay.

detailed and coherent plan for systematically addressing [M.D.'s] significant academic and behavior needs was entered into evidence during the due process hearing" (*id.*).  After reviewing the record evidence, the Hearing Officer found "the evidence . . . overwhelmingly establishes that [M.D.] made . . . no academic progress in the private school and very little behavior progress during the entire period of enrollment."  (*Id.* (citing H.O.'s FF 19, 20, 25, 32, 33, 38); *see also* N.T. 324-26, 344, 367-69, 371-73, 382-84, 418-21, 491, 494-95, 500-02, 513-15, 516-17, 556, 567-68; Pls. Exs. 23, 26, 32.)

In addition to the supported findings of the Hearing Officer, evidence in the record indicates that M.D.'s father "did not think that his son was making progress [at White Clay]," and M.D.'s mother "wanted to know why [M.D.] wasn't making progress."  (*See* N.T. 552.) Evidence also indicates that White Clay did not provide a "reading intervention" teacher until Fall 2010-11 (*see* N.T. 327, 364-65, 490), after receiving the private report (*see* N.T. 365-66). Further, evidence indicates that any attempt at assessing M.D.'s reading comprehension levels is "not entirely applicable, because [M.D.] struggles to read a first-grade reader."  (*See* N.T. 402.) Moreover, evidence indicates that M.D. "has never been a reader of more than sight word books" and he "is not being given age-appropriate material to read and then respond to" since he "can't read it."  (*See* N.T. 402-03.)

Although White Clay "provide[s] standardized assessments," plaintiffs "have not chosen to have [M.D.] tested."  (*See* N.T. 398.)  Testimony also indicates that White Clay did not keep, or seek to obtain, data regarding frequency, duration, and intensity of behaviors (s*ee* N.T. 409), and although there is mention of providing "behavior charts" (*see* N.T. 374, 407-08), no such documents appear to be in the record.  Indeed, evidence from M.D.'s teacher indicates that there was no behavior plan for M.D.  (*See* N.T. 557.)  The record also clarifies that M.D.'s "academic

report card [was] based on work given to him at a first-grade level," and M.D. "is not performing anywhere near a fifth-grade level." (*See* N.T. 353; *see also* N.T. 391-92.)

Evidence in the record indicates that M.D. did not make any progress in reading while at White Clay compared to his curricular level when he left the District, and in fact, comparison shows he "appears to have gone back a step." (*See* N.T. 556, 567-68; *see also* Pls. Ex. 21.) Similarly, evidence indicates that M.D.'s math skills at White Clay were "the same as when he left" the District. (*See* N.T. 556; *see also* N.T. 572.)

Applying the appropriate "modified *de novo* review," *see City of Newark*, 336 F.3d at 263, giving "due weight" to the underlying administrative proceedings, considering the Hearing Officer's factual findings "*prima facie* correct," *see id.* at 269-70, M.D.'s placement at White Clay was not appropriate. *See, e.g., Downingtown*, 2015 WL 3621853, at *5 (affirming District Court's Opinion upholding Hearing Officer's decision that, although school district failed to provide plaintiff a FAPE, plaintiff's private school placement was inappropriate, and therefore plaintiff was not entitled to tuition reimbursement). In that, applying the appropriate standard of review, the record supports the Hearing Officer's finding that M.D.'s private school placement did not provide significant learning and confer meaningful benefit, *see id.* at *5; *DeFlaminis*, 480 F.3d at 276 (citing *Ridgewood*, 172 F.3d at 249), Count I of plaintiff's Amended Complaint requesting tuition reimbursement, fees, and costs is denied.[6] *See Downingtown*, 2015 WL

---

[6] Defendant's brief filed June 26, 2015 addressing subject-matter jurisdiction (ECF Document 32) requests that Count II of plaintiff's Amended Complaint (Section 504 claim) should be dismissed for failure to exhaust administrative remedies. *See* Def.'s Br. re: Subj.-Matter Jurisd. (Doc. 32) at 3. Plaintiffs "**agree** that Count II of the Amended Complaint (Section 504 claim) **must be dismissed** for lack of subject matter jurisdiction," *see* Pls.' Br. re: Exh. of Admin. Remedies for 504 Claims (ECF Document 31) at 3 (parenthetical and emph. added), in that the exhaustion of administrative remedies requirement contemplated in *Batchelor v. Rose Tree Media School District*, 759 F.3d 266 (3d Cir. 2014), has not been satisfied for that claim, *see* Pls.' Br. re: Exh. at 1. Therefore, plaintiffs' Section 504 claim (Count II) is dismissed. The District appears to acknowledge that its Counterclaim which challenges the Hearing Officer's "adverse findings" with respect to the evaluation reports is essentially moot in that plaintiffs' Section 504 claim (Count II) must be dismissed and White Clay was not an "appropriate" placement under the Act for purposes of plaintiffs' IDEA claim (Count I) and it is thus unnecessary to address whether M.D.

3621853, at *5; *see also Hannah L. v. Downingtown Area Sch. Dist.*, 2014 WL 3709980, *1, 7-8

(E.D. Pa. July 25, 2014), *aff'd*, 2015 WL 3621853 (3d Cir. June 11, 2015).  Accordingly,

plaintiff's Motion for Judgment on the Administrative Record is denied, and defendant's cross-

motion is granted insofar as defendant requests judgment in its favor as to Count I of plaintiff's

Amended Complaint.

An appropriate Order follows.

---

was denied a FAPE during the relevant time period.  *See, e.g.,* Def.'s Br. at 11 ("The School District's Counterclaim challenges the hearing officer's adverse findings . . . out of caution as the finding could have a detrimental effect for the School District with respect to Plaintiffs' Section 504 claims."); *id.* (acknowledging that its Counterclaim is being argued only "**[t]o the extent it is necessary** to address the Counterclaim") (emph. added); *see also* Def.'s Opp. to Pls.' Mot. at 7 ("In the end, the issue of how to apply the limitations period, and even [regarding whether M.D. was denied a FAPE] perhaps is moot given the ultimate, correct, outcome – that the private school is not appropriate.").  Accordingly, it is unnecessary for the Court to address further Count II of plaintiff's Amended Complaint and defendant's Counterclaim.